IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Zacharia Adams, Inc., et al.,

                Plaintiffs,                Case No. 3:13 CV 1002

    -vs-

                                    MEMORANDUM OPINION
                                    AND ORDER

United States of America,

                Defendant.

**INTRODUCTION**

Plaintiffs Zacharia Adams, Inc., dba Manhattan Liquor Agency ("Manhattan") and Ayad Itawi (collectively "Plaintiffs") initiated this action seeking judicial review of a final administrative decision by the United States Department of Agriculture ("USDA"), permanently disqualifying the Plaintiffs from participating in the Supplemental Nutrition Program ("SNAP"). The USDA disqualified Manhattan after concluding Plaintiffs had trafficked in SNAP benefits. (Doc. No. 1 at 3). This decision followed an investigation by the Ohio Department of Public Safety ("ODPS"), which utilized a confidential informant.

Before me is the Government's motion for summary judgment. (Doc. No. 29). Plaintiffs filed an opposition (Doc. No. 33) and the Government replied (Doc. No. 36). For the reasons stated below, the Government's motion is denied.

**BACKGROUND**

**Administrative Procedural Background**

On July 15, 2010, Plaintiffs applied for a license to accept and process electronic SNAP

benefits with the Food and Nutrition Service (FNS) -- the USDA agency responsible for the Food Stamp Program -- which was approved on August 6, 2010.[1] (Doc. No. 29-2). On December 12, 2012, FNS sent a letter to Plaintiffs advising them Manhattan was the subject of an investigation by ODPS, and there was evidence the store had violated food stamp regulations on two separate occasions; particularly, May 25, 2012 and June 28, 2012.

On December 14, 2012, Mr. Itawi sent a letter to FNS disputing the alleged violations. (Doc. No. 29-4). Mr. Itawi indicated he had also been criminally charged and was challenging the violations in Toledo Municipal Court. (*Id.*). Later that month, FNS employee Sue Elle spoke with Mr. Itawi and explained FNS would not render a decision until his court case was resolved. However, she also indicated that if Mr. Itawi had not provided a "final written response on his case" by January 17, 2013, FNS would make a decision based on the information it had. (Doc. No. 29-6).

On January 14, 2013, Mr. Itawi wrote FNS informing them his criminal case was scheduled for trial on February 14, 2013. (Doc. No. 29-7 at 1). Also included was a copy of the Toledo Municipal Court docket and photocopies of Mr. Itawi's driver's license, a card showing auxiliary membership to the Lucas County Sheriff's Office, and a VFW membership card. (*Id.*).

On January 22, 2013, Ms. Elle sent an email to FNS section chief Michael Skaer explaining that she told Mr. Itawi FNS would not wait until his criminal case was concluded to render a decision. (Doc. No. 29-8). The next day, FNS wrote Manhattan and advised the store it was being permanently disqualified from the food stamp program effective upon Manhattan's receipt of the FNS letter. (Doc. No. 29-9). The letter also advised Manhattan it no longer qualified for only a civil money penalty because Plaintiffs failed to submit sufficient evidence to demonstrate the store had "established and implemented an effective compliance policy and program to prevent violations" of

---

[1] The USDA has totally eliminated the use of paper food stamp coupons and all food stamp benefits are now loaded electronically onto an Electronic Benefit Transaction card (EBT), which requires a personal identification number to access the benefits.

SNAP benefits. (*Id.*).

On January 24, 2013, Mr. Itawi requested administrative review of the permanent disqualification. (Doc. No. 29-10). FNS acknowledged receipt and instructed Mr. Itawi to forward any additional information in support of his position. (Doc. No. 29-11). FNS explicitly stated, "if there is no information in support of your position, a review cannot be conducted, and . . . the adverse action of the FNS office shall be final." (*Id.*).

On February 14, 2013, Mr. Itawi informed FNS his criminal court case had been continued to March 2013, "where [] the incident will finally be put [to] rest." (Doc. No. 29-12). Mr. Itawi provided no additional information for administrative review as requested.

Accordingly, on April 2, 2013, FNS affirmed the permanent disqualification and notified Mr. Itawi he had 30 days to file a request for judicial review of the agency's determination. (Doc. No. 29-13). On May 2, 2013, Plaintiffs filed this timely request for judicial review.

**Factual Basis for Disqualification**

In the Spring of 2012, ODPS received information from confidential informant Adrian Heninger that Plaintiffs were exchanging cash for merchandise purchased with food stamp benefits at a discount. (Doc. No. 29-14).

Ms. Heninger had been caught shoplifting at a Kroger Supermarket in Toledo, Ohio. At the time of her arrest, Ms. Heninger was an admitted heroin addict. (Doc. No. 29-15 at 9). In exchange for cooperating with law enforcement and receiving treatment for substance abuse, Ms. Heninger would not be prosecuted for shoplifting if she provided information about people who were "abusing the system." (Doc. No. 29-15 at 8). At this time, Ms. Heninger provided information to ODPS that Plaintiffs were giving her cash in exchange for soda purchased with SNAP benefits.

Shortly after receiving substance abuse treatment, Ms. Heninger met with ODPS agents Brian Sargent and David Garcia. Ms. Heninger testified she was not abusing drugs when she met

3

with the agents or when she conducted the undercover purchases as follows. (*Id.* at 15).

On May 22, 2012, Agents Sargent and Garcia instructed Ms. Heninger to make a phone call to Manhattan to see if Mr. Itawi, also known as Tony, was interested in purchasing any product for the store. The transaction was reduced to a written report by Agent Sargent. The following conversation ensued:

> MALE VOICE[2]: Manhattan Liquor.
>
> CONFIDENTIAL INFORMANT[3]: Yes, hi. Can I please speak to Tony?
>
> VOICE: Yeah. Kroger's at [four for ten].[4]
>
> INFORMANT: Kroger's?
>
> MALE VOICE: (Inaudible.)
>
> INFORMANT: What would you need, because I was going to pick them up later on?
>
> MALE VOICE: Do whatever, you know, do a lot of cans, 12-pack cans.
>
> INFORMANT: You want 12 20 packs?
>
> MALE VOICE: Yeah, 12 packs. Like a lot of Pepsi, some Mountain Dew, some diet, some Dr. Pepper.
>
> INFORMANT: Okay. Do you need any 2 liters?
>
> MALE VOICE: 2 liters of -- 2 liters of, I got a lot of Pepsi. 2 liters of Coke and Sprite, if you want, but not Pepsi.
>
> INFORMANT: How about, do you need the 6 pack, the 20 ounces or 24 ounces?
>
> MALE VOICE: Just get Coke, Pepsi, whatever, if they have them at good price. Yeah, get those too.
>
> INFORMANT: Okay. Do you mind, I've got a little bit of things to do this week. Can I come in on Friday? afternoon?

---

[2] The parties concede this is Mr. Itawi's voice.
[3] The parties concede this is Ms. Heninger's voice.
[4] The parties concede Mr. Itawi's reference to "four for ten" meant four six-packs of twelve soda cans or four 24 ounce soda bottles for ten dollars. (*See* Doc. No. 33-2 at 2).

>VOICE: Very good. I'll see you then.
>
>INFORMANT: Okay.

(Doc. No. 29-16 at 2-3).

On May 25, 2012, Agents Sargent and Garcia and Ms. Heninger went to Meijer Supermarket and purchased a variety of soda for $111.00 using a SNAP EBT card utilized by the agents for investigations. Ms. Heninger drove with the agents to Manhattan to deliver the soda.

Both parties agree the audio related to this transaction is not very clear. The Government entered the audio as evidence. (Exhibit P - Audio). The Government also provided transcripts which were "not complete because the audio recording is admittedly not very clear." (Doc. No. 29-1 at 6; Exhibit R, Doc. No. 29-19).

Since there was no stipulation as to the transcripts, I read the transcripts while listening to the audio. Although the audio contains background noise and a few words are difficult to understand, it is not completely inaudible. I was able to discern the following conversation after the May 25, 2012 exchange:

>CONFIDENTIAL INFORMANT: I haven't been in in a while because of the (inaudible).
>
>MALE VOICE: Anything else?
>
>CONFIDENTIAL INFORMANT: No. Are you going to need any more of this? I'm supposed to be getting more money on my food stamp card.
>
>MALE VOICE: Well, I don't want to know how . . . do it but…
>
>CONFIDENTIAL INFORMANT: Oh.
>
>MALE VOICE: Yeah, if you get more, get more. All right.
>
>CONFIDENTIAL INFORMANT: Thank you. Thank you.

(Audio, Exhibit P).

Plaintiffs counter, through a sworn declaration by Mr. Itawi, that "[t]he partially audible

5

comment [by Mr. Itawi] to the effect 'how . . . do it' was something [he] said to the customer [he] was waiting on and was not part of a conversation with Adrian. [He] do[es] not remember exactly what [he] was saying or what Adrian had said about her food stamp card." (Doc. No. 33-2 at 3).

On June 28, 2012 another phone call was placed by Ms. Heninger to Manhattan. The following exchange occurred:

> MALE VOICE: Manhattan Liquor
>
> CONFIDENTIAL INFORMANT: Yes. Hi. Is Tony there?
>
> MALE VOICE: Speaking.
>
> CONFIDENTIAL INFORMANT: Hey, Tony, it's Adrienne. How are you?
>
> MALE VOICE: Good.
>
> CONFIDENTIAL INFORMANT: I was wondering, I'm going to the grocery store and I'm picking up some groceries with my food stamp card. Do you need any pop?
>
> MALE VOICE: Yeah. We can get some pop.

(Doc. No. 29-20). That same day, Ms. Heninger and Agents Sargent and Garcia purchased a variety of soda at Meijer's Supermarket totaling $124.00, and went to Manhattan to deliver the product. Ms. Heninger entered Manhattan alone to speak with Mr. Itawi. Mr. Itawi was not at the store but his nephew Hassan Itawi was present. Ms. Heninger advised Hassan she had purchased the pop at Mr. Itawi's request. Hassan and Ms. Heninger agreed upon a price of $3.00 per item. According to the ODPS "Incident Arrest Report," Ms. Heninger told Hassan she had purchased the soda with her food stamp card, to which Hassan acknowledged by nodding his head. (Doc. No. 29-14 at 3). In a declaration provided by Hassan, he claims "[t]o the best of his recollection, [Ms. Heninger] never said anything about food stamps." (Doc. No. 33-1 at 2). Hassan retrieved $90.00 cash from the register and gave it to Ms. Heninger who then left the store.

## STANDARDS OF REVIEW

Summary judgment is proper where "there is no genuine dispute as to any material fact" and

the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting a genuine issue of material fact must support the argument either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A court views the facts in the record and reasonable inferences which can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court does not weigh the evidence or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The party requesting summary judgment bears an initial burden of demonstrating that no genuine issue of material fact exists, which the party must discharge by producing evidence to demonstrate the absence of a genuine issue of material fact or "by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986) (internal quotation marks omitted). If the moving party satisfies this burden, the nonmoving party "may not rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing Rule 56 and *Matsushita*, 475 U.S. at 586). The party opposing the summary judgment motion must present sufficient probative evidence supporting its claim that disputes over material facts remain; evidence which is "merely colorable" or "not significantly probative" is insufficient. *Anderson*, 477 U.S. at 248-52.

The parties agree judicial review of an administrative action denying an application to participate in the food stamp program is trial *de novo* in which the court shall determine the validity of the questioned administrative action. *Warren v. United States*, 932 F.2d 582, 586 (6th Cir. 1991) (citing Food Stamp Act of 1964, 7 U.S.C. § 2001 et. seq. § 2023(a)). "A district court [must] make its

own findings based upon the preponderance of the evidence and not limit itself to the matters considered in the administrative proceeding." *Id.* (citing *Saunders v. United States*, 507 F.3d 33, 36 (6th Cir. 1974)). The burden of proof is on the plaintiff to establish the invalidity of the administrative action by a preponderance of the evidence. *Id.* The court must determine whether defendant acted within its authority in permanently disqualifying plaintiff from the food stamp program. *Bakal Bros., Inc. v. United States*, 105 F.3d 1085, 1088 (6th Cir. 1997) (citing *Goldstein v. United States*, 9 F.3d 521, 523 (6th Cir. 1993)). If the court finds a violation, it will give deference to the agency when reviewing the imposition of a penalty. *McGlory v. United States*, 763 F.2d 309-10 (7th Cir. 1985). The Court may only overturn a penalty if it is arbitrary and capricious. *Id.*

## ANALYSIS

The Government argues there is no question of fact that Plaintiffs exchanged cash for a product that was purchased using food stamp benefits, and the penalty was not arbitrary or capricious. Plaintiffs argue FNS incorrectly applied the law at the administrative level when it failed to find Plaintiffs acted with the requisite intent pursuant to the regulations. Plaintiffs also argue there are genuine issues of fact with respect to each violation.

Permanent disqualification from SNAP is mandatory on "the first occasion or any subsequent occasion of a disqualification based on the purchase of coupons or trafficking in coupons or authorization cards by a retail food store...." 7 U.S.C. § 2021(b)(3)(B). Only one instance of trafficking is necessary to establish a violation. *See McClain's Market v. United States,* 214 F. App'x 502, 505 (6th Cir. 2006) (citing *Kahin v. United States*, 101 F.Supp.2d 1299, 1303 (S.D. Cal. 2000) ("To survive summary judgment, a plaintiff in a Food Stamp Program disqualification case must raise material issues of fact as to *each* alleged violation.")).

Prior to 2013, the regulatory definition of trafficking lacked any specific mention pertaining to retailer abuse. Instead, trafficking was broadly defined as "the buying or selling of coupons, ATP cards or other benefit instruments for cash or consideration other than eligible food." 7 C.F.R. § 271.2 (2012). On February 21, 2013, the USDA updated the definition of trafficking to remedy this oversight, and to address certain retailer abuses "not specifically addressed in the current definition of trafficking."[5] 78 FR 11967-01 (February 21, 2013). The purpose for the update, among others, was to allow FNS to "take appropriate action against retailers who are . . . colluding with clients to traffic benefits." *Id.* Thus, the definition of trafficking was updated to encompass "the *intentional* purchase of products originally purchased with SNAP benefits in exchange for cash or consideration other than eligible food." *Id.* (emphasis added).

The updated rule, effective March 23, 2013, expanded the trafficking definition to include, in relevant part:

> (1) The buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards, card numbers and personal identification numbers (PINs), or by manual voucher and signature, for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone;
>
> (4) Purchasing a product with SNAP benefits with the intent of obtaining cash or consideration other than eligible food by reselling the product, and subsequently intentionally reselling the product purchased with SNAP benefits in exchange for cash or consideration other than eligible food; or
>
> (5) Intentionally purchasing products originally purchased with SNAP benefits in exchange for cash or consideration other than eligible food.

7 C.F.R. § 271.2 (2013).

---

[5] Because the effective date of the rule change was March 25, 2013, the Court need not determine whether it has retroactive effect as the FNS decision in question was rendered April 2, 2013, and therefore subject to the updated definition.

At the outset, the Government asks me to give deference to agency interpretation of the trafficking definition. However, FNS clearly set forth an outdated definition when determining Manhattan should be disqualified.[6] In doing so, the agency failed to even consider let alone interpret the new definition of trafficking effective March 23, 2013.

While the Government agrees section (5) references the intentional purchasing of products initially purchased with SNAP benefits in exchange for cash, it urges me to apply the broad definition in section (1) as the buying or selling of EBT benefits for cash in general. (Doc. No. 36 at 3). However, basic canons of construction provide "[s]pecific terms [or definitions] prevail over the general[.]" *D. Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208 (1932). Regardless, the Government contends the intentional purchasing referenced in section (5) pertains to the purchaser of the product, "i.e., the food stamp recipient who makes the purchase and not the storeowner." (*Id.*). This is unpersuasive for the following reasons.

First, section (4) explicitly addresses the Government's suggested interpretation by defining trafficking *by a food stamp recipient* as "[p]urchasing a product with SNAP benefits with the intent of obtaining cash or consideration other than eligible food by reselling the product, and subsequently intentionally reselling the product purchased with SNAP benefits in exchange for cash or consideration other than eligible food." § 271.2. Second, a natural reading of section (5) reveals "intentionally" is a modifier for purchasing products already purchased by a SNAP client, and therefore logically applies to a third-party, or retailer. Third, in looking at regulatory intent, it is clear the definition was updated to "take appropriate action against retailers who are . . . colluding with clients to traffic benefits" and to encompass "the *intentional* purchase of products originally

---

[6] FNS provided that trafficking meant "the buying or selling of Food Stamp [SNAP] coupons or other benefit instruments for cash consideration other than eligible food." (*See* Doc. No. 29-13 at 4). This definition mirrors the prior definition of trafficking as illustrated above.

purchased with SNAP benefits in exchange for cash or consideration other than eligible food." 78 FR 11967-01. Accordingly, retailers must have the requisite intent pursuant to the regulations to be permanently disqualified.

There is no dispute Plaintiffs purchased items that were originally purchased with SNAP benefits. Given the updated definition requiring intent, however, Plaintiffs have at the very least established a genuine issue as to whether they did so intentionally.

With respect to the May 28, 2012 incident, Mr. Itawi does not dispute Ms. Heninger stated "[a]re you going to need any more of this soda before I get some more money on my food stamp card?" (See Doc. No. 33 at 10). Instead, Mr. Itawi claims his response - "how … do it" -- was directed at the customer he was ringing up, and points to cash register sounds heard in the background to corroborate. (*Id.*). The parties agree the audio presented as evidence is strained and unclear. I have listed to the audio. Having done so, I pause at Mr. Itawi's explanation. Nevertheless, evidence must be construed in their favor as the non-moving party, and I find Plaintiffs, at a minimum, have raised a genuine issue with respect to this violation.

Plaintiffs have also established a genuine issue with respect to the violation on June 28, 2012. The parties do not dispute Ms. Heninger called Mr. Itawi and said "I'm going to the grocery store and I'm picking up some groceries with my food stamp card. Do you need any pop?" To be clear, Ms. Heninger declared she was purchasing groceries with her food stamp card, and then asked Mr. Itawi if he needed any soda. To conclude Ms. Heninger offered to purchase the soda with her food stamp cards requires me to draw an inference favorable to the Government, which at this stage is not appropriate. My decision concerning these violations is bolstered by Ms. Heninger's testimony that Mr. Itawi never directed her to use her food stamp card to purchase soda, and Plaintiffs' consistent, out-in-the-open practice of using runners for soda during sales.

11

Given the agency's incorrect application of the law and the updated definition requiring intent, Plaintiffs have created a genuine issue with respect to the violations. Accordingly, the Government's motion for summary judgment is denied.

## CONCLUSION

For the reasons stated above, the Government's motion for summary judgment is denied (Doc. No. 29).

So Ordered.

    s/ *Jeffrey J. Helmick*

United States District Judge
